IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Dr. Norma Corrales Martin,<br>                Plaintiff,<br>vs.<br>Clemson University,<br>                Defendant. | Civil Action No. 8:08-354-GRA-WMC<br>**REPORT OF MAGISTRATE JUDGE** |

       This matter is before the court on the defendants' motion for partial dismissal (doc. 57). In her complaint, the plaintiff alleged that the defendant Clemson University, her former employer, discriminated against her because of her gender, race, and national origin, in addition to common law contract and tort claims. The plaintiff also named as defendants certain persons in their individual and official capacities.

       The defendants filed a motion for partial dismissal on December 4, 2008. On April 1, 2009, upon consent of the parties, The Honorable G. Ross Anderson, Jr., Senior United States District Judge, dismissed with prejudice the claims against the natural defendants and allowed the plaintiff to amend her complaint to assert an otherwise time-barred claim under Title VII of the Civil Rights Act of 1964, as amended, against Clemson. Accordingly, the portions of the motion to dismiss relative to the natural defendants are now moot. The plaintiff filed her amended complaint on April 15, 2009. Based upon the foregoing, only the portions of the partial motion to dismiss relative to defendant Clemson are still at issue before this court.

## FACTS PRESENTED

Plaintiff Norma Corrales Martin, Ph.D. ("plaintiff") is a Hispanic female, born in Colombia, South America, and formerly employed by defendant Clemson University ("Clemson" or "defendant") as a lecturer and then as an assistant professor of Spanish from August 1997 to May 2005. Clemson denied her request for tenure in 2005. The plaintiff's employment with Clemson ended in July 2005, when she "left South Carolina to pursue an employment opportunity in Philadelphia." *Martin v. Clemson University, et al.*, 2007 WL 4531028, * 1 (E.D.Pa. 2007) (order granting defendants' motion to dismiss for lack of personal jurisdiction and transferring case to District of South Carolina). The instant action was commenced on February 7, 2007. The plaintiff alleges the following claims in her amended complaint:[1]

> Count I - race and sex discrimination in violation of 42 U.S.C. §§ 1981, 1983, 1985, and 1986;
>
> Count II - violation of the Equal Pay Act;
>
> Count III - violation of Title IX of the Education Amendments of 1972 ;
>
> Count IV - violation of Title VI of the Civil Rights Act of 1964;
>
> Count V - defamation;
>
> Count VI - breach of contract;
>
> Count VII - tortious interference with contractual relations;
>
> Count VIII - fraud;
>
> Count IX - civil conspiracy; and
>
> Count X - Title VII.

---

[1] While the motion to dismiss was filed prior to the amended complaint allowed by Judge Anderson's order, the amended complaint contains only one additional cause of action, Count X, the claim under Title VII. Clemson acknowledges that the new claim is not barred by the Eleventh Amendment (4/1/09 letter, doc. 73).

## APPLICABLE LAW AND ANALYSIS

The defendant has moved to dismiss certain claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Under Rule12(b)(6), a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted).

### *Eleventh Amendment Immunity*

Clemson argues that all but the claims under the Equal Pay Act (Count II), Title IX (Count III), Title VI (Count IV), and Title VII (Count X) are barred by the Eleventh Amendment to the United States Constitution. This court agrees. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

U.S. Const., amend. XI. The Supreme Court has construed the Eleventh Amendment as embracing a fundamental concept of sovereign immunity. As the Court has explained:

> Although by its terms the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States. The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.

*Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (citations omitted). Eleventh Amendment immunity extends not only to the states as such but also to state agencies and organizations that function as an "arm of the state." *Mt. Healthy City School Dist. Bd. of Educ'n v. Doyle*, 429 U.S. 274, 280 (1977). *See Regents of the Univ.*

*of California v. Doe*, 519 U.S. 425, 429 (1997) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities."). The immunity does not, however, "extend to counties and similar municipal corporations." *Mt. Healthy*, 429 U.S. at 280. Thus, the question is whether Clemson University is more like a county or city, or more like an arm of the state. *Id.*

In *Clemson University v. W.R. Grace & Co.*, C.A. No. 2:86-2055-2, 1991 WL 112319 (D.S.C. 1991), The Honorable C. Weston Houck, then United States District Judge,[2] after applying the four-factor analysis prescribed by the Fourth Circuit Court of Appeals in *Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (1987), concluded that Clemson University is an arm of the State of South Carolina. While the issue before Judge Houck was whether Clemson is a "citizen" within the meaning of 28 U.S.C. § 1332 such that the University could invoke diversity jurisdiction and sue a nonresident corporation in federal court, the inquiry that must be undertaken to answer that question is, as Judge Houck noted, essentially the same as the inquiry that must be undertaken to resolve whether an entity is an "arm of the state" for purposes of the Eleventh Amendment. *See W.R. Grace & Co.*, 1991 WL 112319, at *1 (analysis "is virtually identical"); *see also Maryland Stadium Authority v. Ellerbe Becket, Inc.*, 407 F.3d 255, 260 (4th Cir. 2005) ("In determining whether a public entity is an alter ego of the state, and therefore, not a 'citizen' under § 1332, courts have generally looked to the standards announced in cases addressing whether governmental entities are entitled to Eleventh Amendment immunity as an arm of the state.").

The Fourth Circuit Court of Appeals recently reiterated that the determination of whether a particular college or university is an "arm of the state" must be made by

---

[2]Judge Houck has since taken senior status.

applying the *Ram Ditta* analysis. *Maryland Stadium Authority*, 407 F.3d at 260-63. Under *Ram Ditta*, the first factor to be considered in assessing whether an entity is an arm of the state is "whether the state treasury will be responsible for paying any judgment that might be awarded." *Ram Ditta*, 822 F.2d at 457. If the answer to this question is yes, the inquiry is at an end because "if the 'State Treasury will be called upon to pay a judgment against a government entity ... consideration of any other factor becomes unnecessary' and the entity will be immune." *Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002) (quoting *Cash v. Granville County Bd. of Education*, 242 F.3d 219, 223 (4th Cir.2001)). A negative answer to this question, though, does not necessarily mean that Eleventh Amendment immunity does not apply. *Id.* Instead, "if the state's treasury will not be used to satisfy a judgment, [the court] still must determine if the relationship of the entity with the state is close enough to implicate the 'dignity of the State as a sovereign.'" *Id.* (quoting *Cash*, 242 F.3d at 224).

Determining the closeness of the relationship between the entity and the State involves consideration of the remaining three *Ram Ditta* factors: (1) the degree of control exercised by the State over the entity; (2) whether the entity deals with statewide or local concerns; and (3) how the entity is treated by state law. *Kitchen*, 286 F.3d at 184. Judge Houck examined these four factors in the *W.R. Grace & Co.* case and concluded, "after considering the relationship of Clemson University to the State of South Carolina within the framework for analysis outlined in *Ram Ditta*," "that Clemson is not a citizen of South Carolina but is, in fact, an alter ego of the State." *W.R. Grace & Co.*, 1991 WL 112319, at *11.

This court has previously relied on *W.R. Grace & Co.* to hold that Clemson is an arm of the State and, as such, entitled to Eleventh Amendment immunity. *See Larebo v. Clemson University*, C.A. No. 8:97-1935, at 10-11 (D.S.C. 1998), aff'd on other grounds, 175 F.3d 1014 (4th Cir. 1999). *See also Johnson v. South Carolina State University*, No. 5:09-1421-MBS, 2009 WL 1834488, *4 (D.S.C. June 24, 2009) (finding that the plaintiff's

non-discrimination claims were barred by the Eleventh Amendment as South Carolina State University is an alter ego of the State) (citing *W.R. Grace and Co.*, 1991 WL 112319 (court looks into state's control over day-to-day operations to determine that Clemson University is an alter ego of the State)).

As argued by Clemson and explained by Judge Houck, analysis of the *Ram Ditta* factors supports the conclusions reached in *W.R. Grace & Co.* The South Carolina Tort Claims Act ("SCTCA"), S.C. Code Ann. § 15-78-10 *et seq.*, provides that, subject to certain limitations and exemptions, the "State" and its "agencies" (both of which are defined to include state-supported universities) "are liable for their torts in the same manner and to the same extent as a private individual under like circumstances." S.C. Code Ann. § 15-78-40. Similarly, under South Carolina law, a state agency that enters into a contract and thereafter breaches the contract is, like a private individual, liable for the breach. *See Hutchins v. South Carolina Budget and Control Board*, 327 S.E.2d 353.354 (S.C. Ct. App. 1985); *see also Corley v. South Carolina State Highway Dep't*, 109 S.E.2d 164 (S.C. 1959) (affirming judgment against state agency on breach of contract claim). Clemson maintains tort liability insurance through the South Carolina Budget and Control Board's State Insurance Reserve Fund, and that fund would be responsible for paying any judgment for damages and/or attorney's fees on covered tort claims – including the plaintiff's federal law claims for race, sex, and national origin discrimination – up to the policy limits of $1 million (def. m. to dismiss, ex. A). As the Supreme Court explained in *Regents of the University of California v. Doe*, 519 U.S. 425 (1997):

> [N]one of the reasoning in our opinions lends support to the notion that the presence or absence of a third party's undertaking to indemnify the agency should determine whether it is the kind of entity that should be treated as an arm of the State.
> * * *
> [I]t is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant.
> * * *

> Accordingly, we reject respondent's principal contention -- that the Eleventh Amendment does not apply to this action because any award of damages would be paid by the Department of Energy, and therefore have no impact upon the Treasury of the State of California. The Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be indemnified by a third party.

*Id.* at 431.

Similarly, a state university's receipt of funding from sources other than the state legislature – such as tuition, fees, athletic events, grants and the like – does not render the Eleventh Amendment inapplicable, even if a judgment against the university could potentially be paid from these non-state appropriated funds. That is, Eleventh Amendment immunity does not turn on whether the payment of any judgment against a state university would necessarily be made out of state funds appropriated by the state legislature, *see Watson v. University of Utah Medical Center*, 75 F.3d 569, 574-77 (10th Cir. 1996); rather, immunity turns on whether the state treasury – consisting of whatever funds comprise it – is potentially liable, or would otherwise be negatively impacted by a judgment. *See Ristow v. South Carolina Ports Authority*, 58 F.3d 1051, 1054-55 (4th Cir. 1995).

In this case, the state treasury is certainly potentially liable for or, at a minimum, would be negatively impacted by any adverse judgment entered against Clemson. As noted above, the SCTCA specifically defines Clemson (and all other state-supported colleges and universities) as the "State" and a "state agency." *See* S.C. Code Ann. § 15-78-30(a) and (e). That Act makes the State and its agencies liable in tort and provides for recovery of damages up to a maximum of $300,000 per occurrence on state law tort claims. *Id.* § 15-78-120(a)(1). The State, therefore, would clearly be liable for any judgment for damages entered against Clemson on one or more of the plaintiff's tort claims. The fact that Clemson has insurance that would cover some or all of any adverse judgment for money damages that might be entered against it does not, as previously mentioned, affect its entitlement to Eleventh Amendment immunity. *Regents of Univ. of*

7

*Cal.*, 519 U.S. at 431. As a practical matter, the State of South Carolina and its agencies are essentially self-insured. State law requires that state agencies purchase their tort liability insurance from and through the Budget and Control Board, which itself is an arm of the State of South Carolina. *See* S.C. Code Ann. § 1-11-140(A) and (C) (requiring state agencies to purchase and maintain tort liability through Budget and Control Board); *see Gourdine v. Ellis*, 435 F.Supp. 882 (D.S.C. 1977) (holding Budget and Control Board entitled to Eleventh Amendment immunity). Thus, the fact that the Budget and Control Board's Insurance Reserve Fund provides Clemson with tort liability insurance that, in the event an adverse judgment were entered against Clemson, might pay up to a total of $1 million in damages and/or attorney's fees, does not diminish Clemson's entitlement to Eleventh Amendment immunity. Further, any part of a judgment not covered by the tort liability policy issued to Clemson by the Budget and Control Board would have to be paid by the State or Clemson from public funds, thereby negatively impacting the state treasury. *See Ristow*, 58 F.3d at 1054-55.

The plaintiff argues that the fact that the percentage of Clemson's budget represented by state-appropriated dollars has diminished from 48% in the mid-1980s to 25% in 2008 is dispositive of whether Clemson is an arm of the State (pl. supp. memo. 5-6). This court disagrees. The Fourth Circuit Court of Appeals and other courts have recognized that an entity's status as an "arm of the State" does not turn on what percentage of its total budget is comprised of state-appropriated dollars or whether it has "other" dollars with which it could pay a judgment, but on whether the state treasury is potentially liable or would be negatively impacted by a judgment. *See, e.g., Ristow v. S.C. Ports Authority*, 58 F.3d 1051, 1054-55 (4th Cir. 1995); *Lewis v. Midwestern State Univ.*, 837 F.2d 197, 198-99 (5th Cir. 1988). Accordingly, the first factor weighs in favor of Clemson's immunity.

Examination of the remaining three *Ram Ditta* factors reveals that the relationship between Clemson and the State is sufficiently close that a judgment against the

8

University would "implicate the dignity of the State as a sovereign," *Kitchen*, 286 F.3d at 184, such that immunity would apply. The second *Ram Ditta* factor is "whether the entity exercises a significant degree of autonomy from the state." *Ram Ditta*, 822 F.2d at 457-58. Clemson is required to remit to the State Treasurer for deposit in the State's General Fund all tuition payments that it receives. *See* S.C. Code Ann. § 59-107-30 (requiring state-supported colleges and universities to remit all tuition fees received to the State Treasurer). Clemson must prepare an annual budget for submission to the General Assembly through the South Carolina Commission on Higher Education. *Id.* § 59-103-35. Its financial records are subject to annual audit by the State Auditor's office. *Id.* § 11-7-20, and the University's Board of Trustees must report annually to the General Assembly on monies received and expended and provide the legislature with a statement of the condition of the property and funds of the University. *Id.* § 59-119-40. Further, Clemson may issue institution bonds and auxiliary and athletic facilities revenue bonds only with the consent of the State Budget and Control Board and only to the extent permitted by the General Assembly. *Id.* §§ 59-107-40 and -50; 59-119-740; 59-119-940; and 59-147-30. Moreover, proceeds from the sale of approved institutional bonds that are issued in the name of Clemson must be deposited with the State Treasurer, *id.* § 59-107-170, and such bonds are backed by "the full faith, credit and taxing power of the state." *Id.* § 59-107-100. These factors and others, such as Clemson's inability to offer any "new program" "without the approval of the [South Carolina] Commission [on Higher Education.]", *id.* § 59-103-35, reflect the control that the State of South Carolina exercises over Clemson and point to its status as an "arm of the state." *See Maryland Stadium Authority*, 407 F.3d at 264 (citing similar factors as indicative of State of Maryland's control over University of Maryland).

The plaintiff argues that Clemson is a municipal corporation with a separate and distinct identity from the State. The plaintiff notes that the university was created by the will of Thomas Clemson and is controlled by Clemson's Board of Trustees, which

9

consists of a majority of privately-appointed Trustees (pl. opp. m. to dismiss 8-9; pl. supp. memo. 2). In a recent Fourth Circuit Court of Appeals case cited by Clemson, the court explained in dicta that "[m]any . . . state entities have features of independence" including, for example, "public universities in Virginia [that] are governed by boards that have the same powers as corporations," but that such "features of independence" do not make them any less state entities. *Commonwealth of Virginia v. Reinhard*, 568 F.3d 110, 124 (4th Cir. 2009). Similarly here, Clemson may well have "features of independence," but it does not exercise "a significant degree of autonomony from the state." *Ram Ditta*, 822 F.2d at 457-58.

The third and fourth *Ram Ditta* factors – whether Clemson is involved with statewide concerns and how it is regarded as a matter of state law – both support its status as an "arm of the state." Higher education is, by definition, a matter of statewide concern. *See Maryland Stadium Authority*, 407 F.3d at 265 ("Higher education is an area of quintessential state concern and traditional state governmental function."). Moreover, under state law, Clemson is regarded as a state agency or instrumentality. Its employees are state employees with state employee benefits, *see e.g.*, S.C. Code Ann. §§ 8-11-210 *et seq.*; it is denominated a state institution of higher learning in state statutes, *see, e.g.*, S.C. Code Ann. §§ 59-101-10; 59-101-185; 59-107-10; 59-112-10; and it is defined as a state agency and instrumentality for purposes of tort liability. *See* S.C. Code Ann. § 15-78-30(e) ("'State' means the State of South Carolina and any of its officers, agencies, authorities, departments, commissions, boards, divisions, instrumentalities. . . including state-supported . . . universities . . . .").

The plaintiff argues that Clemson's litigation stance in *W.R. Grace & Co.,* in which Clemson argued that it was *not* an arm of the State and was a municipal corporation with a separate and distinct identity from the State, estops it from asserting Eleventh Amendment immunity in this case. This court disagrees. The plaintiff cites no case law for

her position. Further, as argued by the defendant, Judge Houck specifically noted in his opinion that Clemson had previously asserted in state court that it *was* the alter ego of the State. *W.R. Grace & Co.*, 1991 WL 112319, *8. Even so, Clemson was not estopped from taking the opposite stance in *W.R. Grace & Co. Id.* In fact, Judge Houck found that Clemson was regarded as an alter ego of the State as a matter of state law because the state court had agreed with Clemson's prior position that it *was* an arm of the State. *Id.*

Based upon the foregoing, as the court recognized in *W.R. Grace & Co.*, the four *Ram Ditta* factors support the conclusion that Clemson is an arm of the State of South Carolina. As such, Clemson may invoke Eleventh Amendment immunity and is therefore not subject to suit in federal court on any of the claims asserted by the plaintiff unless (1) the state has unequivocally expressed its consent to be sued in federal court on such claims, (2) Congress has abrogated Eleventh Amendment immunity as to one or more of the plaintiff's federal claims pursuant to its power to enforce the Fourteenth Amendment by "appropriate legislation," *see Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. at 363-65, or (3) Congress has extracted a waiver of Eleventh Amendment immunity as a condition of Clemson's receipt of federal funding. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 492 (4th Cir. 2005).

While Congress has abrogated Eleventh Amendment immunity with respect to claims under the Equal Pay Act, *see Usery v. Charleston County Sch. Dist.*, 558 F.2d 1169 (4th Cir. 1977), and has secured a waiver of Eleventh Amendment immunity as a condition of Clemson's receipt of federal financial assistance condition under Titles VI and IX, *see* 42 U.S.C. § 2000d-7 and *Litman v. George Mason Univ.*, 186 F.3d 544, 554 (4th Cir. 1999), Congress has not overridden the States' immunity with respect to the plaintiff's claims under 42 U.S.C. §§ 1981, 1983, 1985 or 1986, nor has South Carolina consented to suit in federal court on these or any of the plaintiff's state law claims.

Based upon the foregoing, Eleventh Amendment immunity bars the plaintiff's federal claims under 42 U.S.C. §§ 1981, 1983, 1985, and 1986 and her remaining state law claims asserted against Clemson. Accordingly, Counts I, V, VI, VII, VIII, and IX should be dismissed.

***Statute of Limitations***

Defendant Clemson next argues that the statute of limitations has expired on the plaintiff's claims under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688, and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d. The plaintiff alleges that Clemson violated Title IX "in that in the conduct of educational programs and activities receiving federal financial assistance they did discriminate against Plaintiff on account of her gender" (amended comp. ¶ 92). She further alleges that Clemson violated Title VI "in that in the conduct of programs and activities receiving federal financial assistance, they discriminated against plaintiff on account of her race and national origin" (*id.* ¶ 94).

> Title VI provides:
>
> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Although the statute does not expressly provide a private right of action for damages, the Supreme Court has held that such a private right of action is implied, at least as to claims of intentional discrimination. *See Cannon v. University of Chicago*, 441 U.S. 677, 701-704 (1979).

The relevant provision of Title IX is substantially similar to Title VI, with Title IX being limited to education programs or activities receiving federal financial assistance and prohibiting discrimination on the basis of sex in such programs or activities:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . . . .

42 U.S.C. § 1681(a). As with Title VI, the Supreme Court has recognized an implied right of action for damages under Title IX. *See Cannon*, 441 U.S. at 701-704. Neither Title VI nor Title IX contains a limitations period for bringing an action. Since both statutes pre-date 28 U.S.C. § 1658(a), which adopted a catchall four-year statute of limitations for civil actions arising under Acts of Congress enacted after December 1, 1990, that did not otherwise provide a limitations period, federal courts must borrow a limitations period from the most analogous state law and apply that limitations period to claims under Titles VI and IX. *See, e.g., R.R. ex rel. R. v. Fairfax County School Bd.*, 338 F.3d 325, 329 & n. 3 (4th Cir. 2003); *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129-30 (4th Cir. 1994); *Wolsky v. Medical College of Hampton Roads*, 1 F.3d 222, 223 (4th Cir. 1993).

The Fourth Circuit Court of Appeals has held in an unpublished case that the South Carolina Human Affairs Law ("HAL"), S.C. Code Ann. § 1-13-10 *et seq.*, is the state law most analogous to a Title IX claim for employment discrimination and that the HAL's one-year statute of limitations therefore applies to such claims arising in South Carolina. *Moore v. Greenwood School Dist. No. 52*, 195 Fed. Appx. 140, 143 (4th Cir. 2006). In *Moore*, a teacher brought a claim under Title IX against the school district that had previously employed him. The Honorable G. Ross Anderson, Jr., then United States District Judge,[3] dismissed the Title IX claim on the ground that the HAL's one-year statute of limitations, not the longer statute of limitations applicable to personal injury claims, was the appropriate state statute to borrow under federal law. On appeal, Moore renewed his argument that the personal injury limitations period, not the period prescribed for bringing claims under the HAL, should govern his employment-based Title IX claim. The Fourth

---
[3] Judge Anderson has since taken senior status.

13

Circuit Court of Appeals disagreed and affirmed Judge Anderson on this point. The court of appeals noted that it had previously held that the personal injury statute of limitations was not always the appropriate "default" statute for federal claims arising under the anti-discrimination provisions of Spending Clause legislation like Title IX. Specifically, *Wolsky* held that a Virginia medical student's claim under Section 504 of the Rehabilitation Act of 1973 was subject to the one-year statute of limitations prescribed by Virginia's Rights of Persons with Disabilities Act, *Wolsky*, 1 F.3d at 224-25, and *McCullough* held that a North Carolina employee's claim under Section 504 was subject to the six-month statute of limitations prescribed by North Carolina's Handicapped Persons Protection Act. *McCullough*, 35 F.3d at 129-32. Since the HAL makes it "an unlawful employment practice for an employer 'to fail or refuse to hire, bar, or discharge from employment or otherwise discriminate against an individual with respect to the individual's compensation or terms, conditions, or privileges of employment because of the individuals's . . . sex, age, national origin, or disability'" and since "the same standard for evaluating claims under the State Human Affairs Law is used for evaluating claims under federal anti-discrimination laws," the court of appeals concluded in *Moore* that a Title IX claim for employment discrimination was "more closely analogous" to a claim under the HAL than to a common law claim for personal injury and that, therefore, the HAL's one-year statute of limitations was the appropriate period to borrow. *Moore*, 195 Fed.Appx. at 143. Based upon the foregoing, the defendant argues that the one year statute of limitations of the HAL should be applied to the plaintiff's Title IX and Title VI claims. The plaintiff argues that this court should not consider the *Moore* case in deciding this motion as a precedential case determines the outcome, as will be discussed below.

    In 2002, the Fourth Circuit Court of Appeals held in a published case, *Franks v. Ross*, 313 F.3d 184 (4th Cir. 2002), that the North Carolina statute of limitations for personal injury actions applied to the plaintiff's Title VI claim. *Id.* at 194 (citing *Jersey*

14

*Heights Neighborhood Association v. Glendening*, 174 F.3d 180, 187 (4th Cir.1999) ("the personal nature of the right against discrimination justifies applying the state personal injury limitations period")). Accordingly, the plaintiff argues that the South Carolina personal injury statute of limitations applies to her claims, and she therefore had three years to file her complaint. *See* S.C. Code Ann. § 15-3-530(5).

The defendant argues that the *Franks* case is at odds with the earlier published Fourth Circuit precedent in *Wolsky* and *McCullough*. In *Wolsky*, the Fourth Circuit stressed (1) that the Supreme Court itself had construed the federal borrowing statute, 42 U.S.C. § 1988(a), as "requir[ing] courts to look to the most appropriate statute in each individual state" and (2) that, in terms of which limitations period is to be borrowed, it is "uniformity within the state," not within a federal circuit, that is "critical." *Wolsky*, 1 F.3d at 223. Therefore, "federal courts should follow the [most analogous] limitations period set by the state in which the district court sits." *Id.* at 224. Because Virginia had a statute that specifically addressed discrimination against disabled persons, the court in *Wolsky* held that the statute of limitations prescribed by that statute, not the limitations period prescribed for personal injury claims, applied to a § 504 claim arising in Virginia. *Id.* at 224-25. In *McCullough*, the court of appeals again reversed a district court that had applied a state's personal injury limitations period to a discrimination claim under Section 504. As it had done in *Wolsky*, the court acknowledged that many circuits have characterized discrimination claims under Section 504 as claims for personal injury and borrowed the personal injury statute of limitations but chose not to follow these circuits' lead. Instead, the Fourth Circuit followed the framework prescribed in *Wilson v. Garcia*, 471 U.S. 261 (1985), which requires the court to "first select the state statute 'most analogous' to the federal claim" and "then consider whether application of th[e] limitations period [applicable to that claim] is consistent with the federal statute and its underlying policies." *McCullough*, 35 F.3d at 129. Following *Garcia*'s guidance, the Fourth Circuit held that the North Carolina

Handicapped Persons Protection Act – which prohibits discrimination on the basis of disability in employment, public accommodations, public services, and public transportation – was "the most analogous [state] statute to [McCullough's employment-based] Rehabilitation Act claim." *Id.* at 130. This was so, the court concluded, notwithstanding that the state Act was not a "perfect counterpart to the Rehabilitation Act." *Id.* at 132. The court's objective, *McCullough* stressed, is not to find the "perfect counterpart" to the federal statute, but to find the state law that is "most similar to the cause of action provided by the [federal statute]." *Id.*

As *Wolsky* and *McCullough* teach, the determination of the appropriate limitations period under Titles VI and IX and like statutes is made with reference to the forum state's particular statutes. In *Jersey Heights Neighborhood Assn. v. Glendening*, 174 F.3d 180 (4th Cir. 1999), the authority cited in *Franks* for the proposition that a Title VI claim is most aptly characterized as a claim for personal injury, the Fourth Circuit specifically noted that, unlike the situation in *McCullough*, Maryland did not have a statute comparable to Title VI. *Id.*, 174 F.3d at 187. The defendant argues that neither *Franks* nor *Glendening* suggests that where, as here, there is a state statute more analogous to the Title VI claim being asserted than the state personal injury statute, the personal injury limitations period is nevertheless controlling. The defendant further argues that if *Franks* were to be construed as the plaintiff suggests – as establishing a circuit-wide rule that the personal injury limitations period is always to be borrowed for purposes of Title VI and like spending clause statutes – *Franks* would be contrary to the holdings in *Wolsky* and *McCullough*, which mandate a state-by-state approach and which specifically reject the notion that a circuit-wide rule is appropriate. The defendant also contends that since one panel of the Fourth Circuit cannot overrule another, *Franks* would have to yield to the earlier precedent of *Wolsky* and *McCullough*. *See McMellon v. United States*, 387 F.3d 329, 333-34 (4th Cir. 2004) (en banc).

The Supreme Court and lower courts have emphasized time and again that Titles VI and IX are to be construed and enforced in like manner. *See, e.g., Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1998); *Preston v. Commonwealth of Virginia ex rel. New River Comm. College*, 31 F.3d 203, 206 n.2 (4th Cir. 1994) ("Congress intended that Title IX be interpreted and enforced in the same manner as Title VI of the Civil Rights Act of 1964 . . . ."). While the parties disagree as to which statute of limitations should apply based upon the *Moore* and *Franks* decisions, the parties agree that Titles VI and IX are to be interpreted in the same manner (def. m. to dismiss 5-6; pl. opp. m. to dismiss 3).

This court agrees with the defendant's position. In the case cited by the plaintiff, *Franks*, which arose in North Carolina, the court found that the North Carolina personal injury statute was the most analogous to the plaintiff's Title VI claim. *Id.*, 313 F.3d at 194. Construing *Franks* in accordance with *Wolsky* and *McCullough*, this court must look to the South Carolina statutes to determine the statute most analogous to the plaintiff's claims under Title VI and Title IX. The South Carolina Human Affairs Law proscribes not only discrimination in employment because of sex but also because of race, color and national origin – the same categories addressed by Titles VI and IX. *See* S.C. Code Ann. § 1-13-80(A). As the court found in *Moore*, since the HAL makes it "an unlawful employment practice for an employer 'to fail or refuse to hire, bar, or discharge from employment or otherwise discriminate against an individual with respect to the individual's compensation or terms, conditions, or privileges of employment because of the individual's . . . sex, age, national origin, or disability'" and since "the same standard for evaluating claims under the State Human Affairs Law is used for evaluating claims under federal anti-discrimination laws," the plaintiff's Titles VI and IX claims for employment discrimination are "more closely analogous" to a claim under the HAL than to a common law claim for personal injury. *See Moore*, 195 Fed.Appx. at 143. *Cf. Childers v. County of York, South*

17

*Carolina*, C.A. No. 06-897-CMC-BM, 2008 WL 552879, * 11 (D.S.C. 2008); *Vandeusen v. Adams*, C.A. No. 06-1092-MBS-JRM, 2007 WL 2891502, * 5 (D.S.C. 2007) (both citing *Moore* in holding that the HAL's one-year limitations period applies to claims arising under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination against the disabled in programs and activities receiving federal funding).

Based upon the foregoing, this court finds that the HAL's one-year statute of limitations should be applied to the plaintiff's Titles VI and IX claims. The plaintiff filed the instant action on February 7, 2007. The plaintiff was denied tenure in April 2005, and she initiated internal grievance proceedings in May 2005. *Martin v. Clemson University, et al.*, 2007 WL 4531028, *1 (E.D. Pa. 2007). The plaintiff argues that the statute began to run in March 2007, when Clemson issued its final ruling on her grievance appeal. However, the United States Supreme Court has ruled in a similar case "that the limitations period commenced to run when the tenure decision was made and [the plaintiff] was notified." *Delaware State College v. Ricks*, 449 U.S. 250, 259 (1980). Here, all of the plaintiff's factual allegations center around the denial of tenure, which occurred in 2005 (amended comp. ¶¶ 31-54). The fact that she subsequently appealed that denial of tenure did not re-start the clock. The Seventh Circuit Court of Appeals considered a similar situation in *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir. 1992). The court ruled as follows:

> An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination. If it were, then an employee could avoid the [statute of limitations] by filing a series of appeals or fresh requests; *Ricks* and *Chardon* hold that adverse decisions on appeals do not re-start the time for filing a charge. . . . [W]hen the first decision is connected to and implies the second-when, in other words, a single discriminatory decision is taken, communicated, and later enforced despite pleas to relent-the time starts with the initial decision. . . .

*Id.* at 556 (citations omitted). Based upon the foregoing, the plaintiff's complaint was filed outside the applicable one year statute of limitations. Accordingly, her Titles VI and IX claims (Counts III and IV) should be dismissed.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the defendant's partial motion to dismiss be granted as to Counts I, III, IV, V, VI, VII, VIII, and IX.

IT IS SO ORDERED.

WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

July 23, 2009

Greenville, South Carolina